UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY DAUNT, et al.,

      Plaintiffs,

v.

JOCELYN BENSON, et al.,

      Defendants.

_____

Case No. 1:19-cv-614
(Lead)

MICHIGAN REPUBLICAN PARTY, et al.,

      Plaintiffs,

v.

JOCELYN BENSON, et al.,

      Defendants.

_____/

Case No. 1:19-cv-669
(Member)

HON. JANET T. NEFF

## **OPINION AND ORDER**

These consolidated cases involve federal constitutional claims brought under 42 U.S.C.

§ 1983 against Michigan Secretary of State Jocelyn Benson regarding the creation and

administration of Michigan's Independent Citizens Redistricting Commission for State Legislative

and Congressional Districts ("the Commission").  Plaintiffs in Case No. 1:19-cv-614 are fifteen

individuals who are allegedly excluded from serving on the Commission.  Plaintiffs in Case No.

1:19-cv-669 are the Michigan Republican Party (MRP) and MRP's current chair, members,

affiliates and/or relatives, who are also allegedly excluded from serving on the Commission.  This

Court permitted "Count MI Vote" d/b/a "Voters Not Politicians" (hereinafter VNP) to intervene as a Defendant in both actions. Plaintiffs in both cases filed with their complaints a motion for a preliminary injunction. Defendants opposed any injunctive relief and filed motions to dismiss both cases. This Court denied injunctive relief, a decision that was affirmed on appeal, and the Court now turns to the motions to dismiss. Having considered the parties' submissions, the Court concludes that oral argument is not necessary to resolve the issues presented. See W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court grants the motions to dismiss these cases.

## I. BACKGROUND

### A. Factual Background

**1.** **The Ballot Proposal**

Every ten years following the decennial United States Census, Michigan adjusts its state legislative and congressional district boundaries based on the population changes reflected in the census (Compl. ¶ 25, ECF No. 1 at PageID.8).[1] Until November 2018, the Michigan Legislature redrew the congressional and state legislative district boundaries (*id.*). Redistricting plans were adopted if approved by a simple majority vote in both chambers of the state legislature and subsequently signed by the governor (*id.*). The state legislature last approved new congressional district boundaries on June 29, 2011, and the governor signed them into law on August 9, 2011 (*id.*). The 2011 redistricting plan was the subject of ongoing litigation (*id.* n.1).

On December 18, 2017, VNP filed an initiative petition with the Secretary of State that proposed amending the Michigan Constitution to establish a permanent Citizens Redistricting Commission in the legislative branch to redistrict Michigan's state legislative and congressional

---

[1] Consistent with the Court's consolidation order (ECF No. 30), docket references are to entries in the Lead Case, unless otherwise noted.

districts every ten years (Compl. ¶ 26, ECF No. 1 at PageID.10).  The Commission would replace the existing legislative process and eliminate any legislative oversight of the redistricting process (*id.*).

As the Michigan Court of Appeals explained in its June 7, 2018 Opinion approving submission of VNP's proposal to the voters, VNP offered the proposed constitutional amendment "to remedy the widely-perceived abuses associated with partisan 'gerrymandering' of state legislative and congressional election districts by the establishment of new constitutionally mandated procedures designed to ensure that the redistricting process can no longer be dominated by one political party." *Citizens Protecting Michigan's Constitution v. Sec'y of State*, 922 N.W.2d 404, 410 (Mich. Ct. App. 2018), aff'd, 921 N.W.2d 247 (Mich. 2018).

On June 20, 2018, the Michigan Board of State Canvassers certified that the initiative petition had a sufficient number of valid signatures and added it as "Michigan Ballot Proposal 18-2" to the November 6, 2018 general election ballot (Compl. ¶ 27, ECF No. 1 at PageID.10).  Ballot Proposal 18-2 provided the following:

*Statewide Ballot Proposal 18-2*

A proposed constitutional amendment to establish a commission of citizens with exclusive authority to adopt district boundaries for the Michigan Senate, Michigan House of Representatives and U.S. Congress, every 10 years.

*This proposed constitutional amendment would:*

- Create a commission of 13 registered voters randomly selected by the Secretary of State:

  - 4 each who self-identify as affiliated with the 2 major political parties; and

  - 5 who self-identify as unaffiliated with major political parties.

- Prohibit partisan officeholders and candidates, their employees, certain relatives, and lobbyists from serving as commissioners.

- Establish new redistricting criteria including geographically compact and contiguous districts of equal population, reflecting Michigan's diverse population and communities of interest. Districts shall not provide disproportionate advantage to political parties or candidates.

- Require an appropriation of funds for commission operations and commissioner compensation.

Should this proposal be adopted?

[ ] YES
[ ] NO

*Id.* ¶ 28. Michigan voters passed the ballot proposal on November 6, 2018, and the Michigan Constitution was amended according to the revised language that accompanied the ballot proposal (*id.* ¶ 29). The amendment became effective on December 22, 2018. *See* MICH. CONST. 1963, Art. XII, § 2.

## 2. <u>The Amendment</u>

Articles IV through VI of the amended Michigan Constitution set forth specific details of the Commission including the application process, eligibility criteria, and process for seeking and selecting commissioners (Compl. ¶ 27, ECF No. 1 at PageID.10). Article IV pertains to the legislative branch, whereas Articles V and VI pertain to the executive and judicial branches. The eligibility criteria are found in Article IV, § 6 (1) of the Michigan Constitution, as amended, as follows:

(1) An independent citizens redistricting commission for state legislative and congressional districts (hereinafter, the "commission") is hereby established as a permanent commission in the legislative branch. The commission shall consist of 13 commissioners. The commission shall adopt a redistricting plan for each of the following types of districts: state senate districts, state house of representative districts, and congressional districts.

(a) Be registered and eligible to vote in the state of Michigan;

(b) Not currently be or in the past 6 years have been any of the following:

4

(i)     A declared candidate for partisan federal, state, or local office;

(ii)    An elected official to partisan federal, state, or local office;

(iii)   An officer or member of the governing body of a national, state, or local political party;

(iv)    A paid consultant or employee of a federal, state, or local elected official or political candidate, of a federal, state, or local political candidate's campaign, or of a political action committee;

(v)     An employee of the legislature;

(vi)    Any person who is registered as a lobbyist agent with the Michigan bureau of elections, or any employee of such person; or

(vii)   An unclassified state employee who is exempt from classification in state civil service pursuant to article XI, section 5, except for employees of courts of record, employees of the state institutions of higher education, and persons in the armed forces of the state;

(c) Not be a parent, stepparent, child, stepchild, or spouse of any individual disqualified under part (1)(b) of this section; or

(d) Not be otherwise disqualified for appointed or elected office by this constitution.

(e) For five years after the date of appointment, a commissioner is ineligible to hold a partisan elective office at the state, county, city, village, or township level in Michigan.

MICH. CONST. Art. IV, § 6 (1).

As Secretary of State, Defendant Benson is the "chief election officer of the state" and is responsible for overseeing the conduct of elections.  Mich. Comp. Laws § 168.21.  Subsection (2) of § 6 instructs Secretary Benson in the selection of commissioners, as follows:

(a) The secretary of state shall do all of the following:

(i)     Make applications for commissioner available to the general public not later than January 1 of the year of the federal decennial census. The secretary of state shall circulate the applications in a manner that invites wide public participation from different regions of the state. The secretary of state shall also mail applications for commissioner to ten thousand Michigan registered voters, selected at random, by January 1 of the year of the federal decennial census.

5

(ii)     Require applicants to provide a completed application.

(iii)    Require applicants to attest under oath that they meet the qualifications set forth in this section; and either that they affiliate with one of the two political parties with the largest representation in the legislature (hereinafter, "major parties"), and if so, identify the party with which they affiliate, or that they do not affiliate with either of the major parties.

(b) Subject to part (2)(c) of this section, the secretary of state shall mail additional applications for commissioner to Michigan registered voters selected at random until 30 qualifying applicants that affiliate with one of the two major parties have submitted applications, 30 qualifying applicants that identify that they affiliate with the other of the two major parties have submitted applications, and 40 qualifying applicants that identify that they do not affiliate with either of the two major parties have submitted applications, each in response to the mailings.

(c) The secretary of state shall accept applications for commissioner until June 1 of the year of the federal decennial census.

(d) By July 1 of the year of the federal decennial census, from all of the applications submitted, the secretary of state shall:

(i)     Eliminate incomplete applications and applications of applicants who do not meet the qualifications in parts (1)(a) through (1)(d) of this section based solely on the information contained in the applications;

(ii)    Randomly select 60 applicants from each pool of affiliating applicants and 80 applicants from the pool of non-affiliating applicants. 50% of each pool shall be populated from the qualifying applicants to such pool who returned an application mailed pursuant to part 2(a) or 2(b) of this section, provided, that if fewer than 30 qualifying applicants affiliated with a major party or fewer than 40 qualifying non-affiliating applicants have applied to serve on the commission in response to the random mailing, the balance of the pool shall be populated from the balance of qualifying applicants to that pool. The random selection process used by the secretary of state to fill the selection pools shall use accepted statistical weighting methods to ensure that the pools, as closely as possible, mirror the geographic and demographic makeup of the state; and

(iii)   Submit the randomly-selected applications to the majority leader and the minority leader of the senate, and the speaker of the house of representatives and the minority leader of the house of representatives.

(e) By August 1 of the year of the federal decennial census, the majority leader of the senate, the minority leader of the senate, the speaker of the house of representatives,

6

and the minority leader of the house of representatives may each strike five applicants from any pool or pools, up to a maximum of 20 total strikes by the four legislative leaders.

(f)  By September 1 of the year of the federal decennial census, the secretary of state shall randomly draw the names of four commissioners from each of the two pools of remaining applicants affiliating with a major party, and five commissioners from the pool of remaining non-affiliating applicants.

MICH. CONST. Art. IV, § 6 (2).

In June 2019, the United States Supreme Court, in holding that partisan gerrymandering is non-justiciable, pointed to the establishment of independent redistricting commissions as a way that states are "restricting partisan considerations in districting through legislation," specifically referencing Michigan's 2018 adoption of Article 4, § 6.  *Rucho v. Common Cause*, ___ U.S. ___, ___; 139 S. Ct. 2484, 2507 (2019).

In July 2019, Secretary Benson released draft text of the application to serve as a commissioner on its website and invited the public to comment until August 9, 2019 (Compl. ¶ 33, ECF No. 1 at PageID.13).  The draft application asks a series of questions to ". . . make sure you're eligible and don't have any conflicts that would keep you from serving on the Citizens' Redistricting Commission" (*id.*, quoting App. A).  The draft application explains that if the applicant answers "yes" to any one of the following statements, then the applicant is ". . . not eligible to serve on the commission . . . ":

(2)  I am now, or have been at any time since August 15, 2014

a.  A declared candidate for a partisan election office in federal, state, or local[;]

b.  An elected official to partisan federal, state, or local office[;]

c.  An officer or member of the governing body of a political party, at the local, state, or national level[;]

7

      d.      A paid consultant or employee of a federal, state, or local elected official or political candidate, campaign, or political action committee[;]

      e.      An employee of the legislature[;]

      f.      A lobbyist agent registered with the Michigan Bureau of Elections[;]

      g.      An employee of a lobbyist registered with the Michigan Bureau of Elections[;]

(3)      I am a parent, stepparent, child, stepchild, or spouse of a person to whom sections (a) through (g), above, would apply[;]

(4)      I am disqualified for appointed or elected office in Michigan[.]

*Id.* The draft application also asks applicants to state whether they identify with the Democratic Party, the Republican Party, or neither party (*id.*). It also provides the applicant with the option of explaining his or her affiliation with the following question, ". . . [b]ecause Michigan voters do not register to vote by political party, if you would like to describe why—or how—you affiliate with either the Democratic Party, Republican Party, or neither, please do so below" (*id.*).

The Secretary of State also released on its website, for public comment until August 9, 2019, draft Commissioner Eligibility Guidelines (Compl. ¶ 34, ECF No. 1 at PageID.14-15, citing App. B). The draft guidelines provide clarification on the scope of the categories of individuals excluded from eligibility to serve on the Commission (*id.* at PageID.15). For example, the draft guidelines specify that a candidate for judge may be eligible to serve on the Commission because judicial officers are non-partisan (*id.*). Further, the guidelines state that volunteers of an elected official, political candidate, campaign, or political action committee may be eligible to serve on the Commission because volunteers are not paid for their services (*id.*). In contrast, the eligibility guidelines state that any individual serving as a paid consultant or employee of a non-partisan elected official, non-partisan political candidate or nonpartisan local political candidate's

campaign since August 15, 2014, may not be eligible to serve on the Commission because the language of the exclusion is not explicitly limited to partisan offices (*id.*).

Each commissioner holds office until the Commission has completed its obligations for the census cycle.  MICH. CONST. Art. IV, § 6 (18).  Commissioners receive compensation at least equal to 25 percent of the governor's salary, and the State will reimburse commissioners for costs incurred if the legislature does not appropriate sufficient funds to cover these costs.  § 6 (5).  "[M]embers of . . . commissions" do not hold "classified state civil service" positions.  MICH. CONST. Art. XI, § 5.

The Secretary of State serves as Secretary of the Commission and, in that capacity, furnishes, under the direction of the Commission, "all technical services that the commission deems necessary."  MICH. CONST. Art. IV, § 6 (4).  The Secretary of State is a non-voting member of the Commission.  *Id.*

The affirmative votes of at least seven members, including a minimum of two Democrats, two Republicans, and two members not affiliated with the major parties, are needed to pass a redistricting plan.  MICH. CONST. Art. IV, § 6 (14)(C).  Commissioners are required to prioritize specific criteria when developing redistricting plans, including compliance with federal laws; equal population sizes; geographic contiguousness; demographics and communities of similar historical, cultural, or economic interests; no advantages to political parties; no advantages to incumbents; municipal boundaries; and compactness.  § 6 (13).

The new Article IV, § 6 (11) also includes an open-meeting requirement, which instructs that

> [t]he commission, its members, staff, attorneys, and consultants shall not discuss redistricting matters with members of the public outside of an open meeting of the commission, except that a commissioner may communicate about redistricting matters with members of the public to gain information relevant to the performance

9

of his or her duties if such communication occurs (a) in writing or (b) at a previously publicly noticed forum or town hall open to the general public.

MICH. CONST. Art. IV, § 6 (11).

Last, the newly amended Article IV, § 6 includes a severability clause that prescribes severance of any provision found to be in conflict with the United States Constitution or federal law, and directs that the provisions of that section be implemented to the maximum extent allowable under the Constitution and federal law:

> (20) This section is self-executing.  If a final court decision holds any part or parts of this section to be in conflict with the United States constitution or federal law, the section shall be implemented to the maximum extent that the United States constitution and federal law permit.  Any provision held invalid is severable from the remaining portions of this section.

MICH. CONST. Art. IV, § 6 (20).

## B.  Procedural Posture

### 1.  The Lead Case

On July 30, 2019, nearly nine months after the passage of Proposal 18-2, fifteen Plaintiffs filed this Lead Case against Secretary Benson, in her official capacity (Compl. ¶ 22, ECF No. 1 at PageID.8).  The Lead Plaintiffs allege two counts:  Violation of the First Amendment (Count I) and Violation of Equal Protection (Count II).  Their claims concern the make-up of the Commission.  Plaintiffs allege that they are individuals affiliated with the Republican Party who are "excluded from serving on the Commission because they fall into one or more of [the] eight categories" described above (*id.* ¶ 2).  Specifically, Plaintiffs make the following allegations relevant to the eight categories:

*"**Declared candidate for partisan federal, state, or local office**,"* MICH. CONST. Art. IV, § 6 (1)(b)(i).  Plaintiff Aaron Beauchine became a declared Republican candidate for Ingham County Commissioner, a local partisan office, on March 15, 2018 (Compl. ¶ 9, ECF 1 at PageID.5).

10

"***Elected official to partisan federal, state, or local office,***" MICH. CONST. Art. IV, § 6 (1)(b)(ii).  Plaintiff Tom Barrett became a declared candidate for partisan state office on September 13, 2017 and was elected as a Republican to the Michigan Senate in November 2018 (Compl. ¶ 8, ECF 1 at PageID.5).  His term of office began January 1, 2019 (*id.*).  Several Plaintiffs— Linda Tarver, Mary Shinkle, Norm Shinkle and Clint Tarver—also serve as elected Republican precinct delegates (*id.* ¶¶ 14, 17, 18 & 21).

"***Officer or member of the governing body of a national, state, or local political party,***" MICH. CONST. Art. IV, § 6 (1)(b)(iii).  Plaintiff Anthony Daunt has served as an officer and member of the governing body of the Clinton County Republican Party since 2017 (Compl. ¶ 7, ECF 1 at PageID.5).  Since April 2017, Plaintiff Anthony Daunt has also served as a member of the governing body of the Michigan Republican Party Committee (*id.*).  Plaintiff Kathy Berden has served as the national committeewoman of the Republican Party since 2016 (*id.* ¶ 10).  Plaintiff Gerry Hildenbrand has been a member of a governing body of a national, state, or local political party since 2017 (*id.* ¶ 12).  Plaintiff Linda Tarver serves as President of the Republican Women's Federation of Michigan, which is a voting member of the Michigan Republican Party's State Central Committee (*id.* ¶ 14).  Plaintiff Marian Sheridan has been a member of a governing body of a state political party since February 2019, specifically the Grassroots Vice Chair of the Michigan Republican Party (*id.* ¶¶ 16 & 19).  Plaintiff Mary Shinkle has served as the Vice Chair of the Ingham County Republican Party, a local political party, since November 2018 (*id.* ¶ 17).  And Plaintiff Norm Shinkle has been an officer or member of a governing body of a state political party since February 2017 (*id.* ¶ 18).

*"A paid consultant or employee of a federal, state, or local elected official or political candidate, of a federal state, or local political candidate's campaign, or of a political action committee,"* MICH. CONST. Art. IV, § 6 (1)(b)(iv).  Plaintiff Gary Koutsoubos has been a consultant to a candidate(s) for a federal, state, or local office or a political action committee since July 8, 2017 (Compl. ¶ 13, ECF 1 at PageID.6).  Plaintiff Patrick Meyers has been a paid consultant to candidate(s) for federal, state, or local office or a political action committee since 2010 (*id.* ¶ 15). Plaintiff Mary Shinkle was an employee of Republican Congressman Mike Bishop, a federal elected official, between 2015 and 2018 (*id.* ¶ 17).

*"Employee of the Legislature,"* MICH. CONST. Art. IV, § 6 (1)(b)(v).  Plaintiff Stephen Daunt has been an employee of the Michigan Legislature since January 1, 1991 (Compl. ¶ 11, ECF 1 at PageID.6).

*"Any person who is registered as a lobbyist agent with the Michigan bureau of elections…,"* MICH. CONST. Art. IV, § 6 (1)(b)(iv).  Plaintiff Anthony Daunt has served as a registered lobbyist agent in the State of Michigan since August 2013 (Compl. ¶ 7, ECF 1 at PageID.5).

*"An unclassified state employee who is exempt from classification…,"* MICH. CONST. Art. IV, § 6 (1)(b)(vii).  Plaintiff Koutsoubos was an unclassified state employee between March 2014 and June 2017 (Compl. ¶ 13, ECF 1 at PageID.6).

*"[A] parent, stepparent, child, stepchild, or spouse of any individual disqualified under part (1)(b),"* MICH. CONST. Art. IV, § 6 (1)(c).  Plaintiffs Norm and Mary Shinkle are husband and wife (Compl. ¶ 17-18, ECF 1 at PageID.7).  Plaintiffs Clint Tarver and Linda Lee Tarver are husband and wife (*id.* ¶ 21).  Plaintiff Paul Sheridan is the son of Plaintiff Marian Sheridan (*id.* ¶ 19).  And Plaintiff Bridget Beard is the daughter of Plaintiff Marian Sheridan (*id.* ¶ 20).

The Lead Plaintiffs indicate that they "each desire to serve on the Commission but are excluded from consideration" (Compl. ¶ 39, ECF 1 at PageID.17).  The Lead Plaintiffs seek to have this Court (1) declare the Commission "unconstitutional and invalid and the administration of the selection of commissioners a violation of Plaintiffs' constitutional rights," and (2) enjoin Defendant Benson and her employees and agents from administering or preparing for the selection of commissioners to serve on the Commission (*id.* at PageID.31).  The Lead Plaintiffs accompanied their Complaint with a Motion for a Preliminary Injunction (ECF No. 4), seeking to have this Court "direct the Secretary of State to suspend her implementation of all provisions of the Michigan Constitution relating to the Commission including any preparations for the selection of commissioners" (*id.* at PageID.90).

2.    **The Member Case**

On August 22, 2019, the MRP and five individual Plaintiffs filed the Member Case, alleging the following five claims:

I.      Violation of Freedom of Association [MRP]
II.     Violation of Freedom of Association [Individual Plaintiffs]
III.    Violation of Freedom of Speech—Viewpoint Discrimination
IV.     Violation of Freedom of Speech—Restricted Speech
V.      Violation of Equal Protection

Like the Lead Plaintiffs, the Member Plaintiffs also challenge the eligibility criteria of amended Article 4.  It is not in dispute that the MRP is a "major political party" as that term is defined in Michigan's Election Law, MICH. COMP. LAWS § 168.16, and used in the challenged provisions. Plaintiffs make the following allegations relevant to four of the enumerated categories:

*"Declared candidate for partisan federal, state, or local office*," MICH. CONST. Art. IV, § 6 (1)(b)(i).  Plaintiff Laura Cox has, within the past six years, been a declared candidate for the partisan offices of state representative and state senator (Member Compl. ¶ 21, ECF No. 1 at

PageID.5).  Within the past six years, Plaintiff Terri Lynn Land was a declared candidate for United States Senator and precinct delegate, both partisan offices (*id.* ¶ 22). Within the past six years, Plaintiff Dorian Thompson was also a candidate for the partisan office of precinct delegate (*id.* ¶ 24).  Plaintiff Hank Vaupel was a declared candidate for state representative within the past six years (*id.* ¶ 25).

 *"Elected official to partisan federal, state, or local office*," Mich. Const. Art. IV, § 6 (1)(b)(ii).  Plaintiff Cox served as a Wayne County Commissioner from 2005 through 2014, and as a state representative from 2015 through 2018 (Member Compl. ¶ 21, ECF No. 1 at PageID.5). Plaintiffs Land and Thompson served as elected precinct delegates (*id.* ¶¶ 22 & 24).  Plaintiff Vaupel is currently an elected state representative (*id.* ¶ 25).

 *"Officer or member of the governing body of a national, state, or local political party,"* Mich. Const. Art. IV, § 6 (1)(b)(iii).  Plaintiff Cox is currently the chair of the MRP (Member Compl. ¶ 21, ECF No. 1 at PageID.5).  Plaintiff Land is currently the chair of the 3rd Congressional District for MRP and in that capacity serves as a member of the MRP State Committee (*id.* ¶ 22). Land also served as the "National Committeewoman" of the MRP from 2012 through 2014 (*id.*). Plaintiff Vaupel is currently a member of the Livingston County Republican Party Executive Committee (*id.* ¶ 25).

 *"[A] parent, stepparent, child, stepchild, or spouse of any individual disqualified under part (1)(b),"* Mich. Const. Art. IV, § 6 (1)(c).  Plaintiff Savina Alexandra Zoe Mucci is the daughter of Tonya Schuitmaker, who is a former state senator and was the declared candidate for the office of attorney general in the 2018 election (Member Compl. ¶ 23, ECF No. 1 at PageID.6).

 The Member Plaintiffs allege that they each "wish to apply to serve on the [C]ommission when applications are made available but are ineligible to hold such public office under the terms

of the VNP Proposal" (Member Compl. ¶ 61, ECF No. 1 at PageID.15).[2]  The Member Plaintiffs

seek to have this Court (1) "declar[e] the VNP Proposal unconstitutional under the First and

Fourteenth Amendments to the United States Constitution," and (2) "enjoin[] Defendant from

implementing, administering, or otherwise enforcing the VNP Proposal" (*id.* at PageID.24).  The

Member Plaintiffs accompanied their Complaint with a Motion for a Preliminary Injunction

(Member Case, ECF No. 2), requesting "an Order enjoining Defendant Secretary of State, and her

employees and agents, from implementing all provisions of the VNP Proposal" (Member Case,

ECF No. 3 at PageID.75).

**3.    <u>Consolidation</u>**

On September 11, 2019, this Court consolidated *Daunt* with *MRP* (ECF No. 30).  During

September 2019, the parties completed their briefing on the motions for a preliminary injunction

and filed briefs in support of and in opposition to Defendants' motions to dismiss.  On November

25, 2019, this Court issued its Opinion and Order denying both motions for a preliminary

injunction (ECF Nos. 67 & 68), thereby permitting implementation of all provisions of the

Michigan Constitution relating to the Commission, including any preparations for the selection of

commissioners.  Plaintiffs filed interlocutory appeals with the Court of Appeals for the Sixth

Circuit (ECF Nos. 69 & 71), which affirmed this Court's decision (ECF No. 73).

A mandate was issued on June 29, 2020 (ECF No. 74), and the Court now turns to the

pending motions to dismiss: VNP's (ECF No. 33) and Secretary Benson's (ECF No. 42) motions

to dismiss the Lead Plaintiffs' Complaint, and VNP's (ECF No. 37) and Secretary Benson's (ECF

---

[2] Although Michigan voters approved the "VNP proposal" on November 6, 2018, and the amendments have been in effect since December 22, 2018, the Member Plaintiffs' August 22, 2019 Complaint (and their motion briefing) nonetheless uses the phrase "VNP Proposal."  The Court has simply interpreted their references to the "proposal" to mean the enacted provisions.

No. 48) motions to dismiss the Member Plaintiffs' Complaint.  The parties have not sought leave to file any supplemental briefing or authorities for this Court's review.

## II.   ANALYSIS

### A.   Motion Standards

**1.   <u>Section 1983</u>**

Plaintiffs' claims are brought under 42 U.S.C. § 1983.  Section 1983 does not confer substantive rights but merely provides a means to vindicate rights conferred by the Constitution or laws of the United States.  *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010).  Specifically, § 1983 provides a cause of action against a government official who performs discretionary duties in a manner that deprives an individual of a right secured by the Constitution or laws of the United States, if the right was clearly established at the time of the deprivation.  *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 418 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To state a claim under 42 U.S.C. § 1983, "'a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'"  *Scott v. Kent Cty.*, 679 F. App'x 435, 438 (6th Cir. 2017) (citation omitted).

**2.   <u>Rule 12</u>**

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move for dismissal based on a plaintiff's "failure to state a claim upon which relief can be granted[.]"  FED. R. CIV. P. 12(b)(6).  A motion asserting this defense "must be made before pleading if a responsive pleading is allowed."  *Id.*  Subsection (c) of Rule 12 provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).

Secretary Benson seeks dismissal of Plaintiffs' claims under Rule 12(b)(6), and Intervenor-Defendant VNP moves under Rule 12(c) for a judgment on the pleadings "in order to facilitate complete and efficient final adjudication and review of all of the issues presented in this matter" (ECF No. 33 at PageID.386-387; ECF No. 37 at PageID.481).[3] A judgment under subsection (c) of Rule 12 is "technically unavailable" because Defendants have not yet filed any answers and thus the pleadings are not "closed" as required by the rule. *F.R.C. Int'l, Inc. v. United States*, 278 F.3d 641, 642 (6th Cir. 2002). *See also* 5C FED. PRAC. & PROC. CIV. § 1367, Judgment on the Pleadings—In General (3d ed.) ("The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court."). "The difference, however, is purely aesthetic[.]" *Carroll v. City of Cleveland*, 522 F. App'x 299, 302 (6th Cir. 2013). The standard of review is the same whether a defendant's challenge to the legal basis for a plaintiff's complaint is brought under Rule 12(b)(6) or 12(c). *Gavitt v. Born*, 835 F.3d 623, 639 (6th Cir. 2016).

Specifically, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). The court

---

[3] VNP also argues under Rule 12(b)(1) that this Court should dismiss the claims of the individual Plaintiffs for lack of subject-matter jurisdiction based on the doctrine of standing (ECF No. 34 at PageID.405-408; ECF No. 38 at PageID.499-503). Similarly, Secretary Benson argues that the doctrine of laches requires dismissal of Plaintiffs' Complaints (ECF No. 43 at PageID.604-608; ECF No. 49 at PageID.701-705). Defendants included these threshold arguments in their responses to Plaintiffs' motions for preliminary injunctions, arguments that this Court previously considered and rejected. Specifically, this Court concluded that the individual Plaintiffs adequately alleged Article III standing sufficient to warrant their invocation of federal-court jurisdiction (ECF No. 67 at PageID.946) and that the doctrine of laches does not prevent a plaintiff from obtaining prospective injunctive relief, which is all that Plaintiffs in these cases seek (*id.* at PageID.947-948). Additionally, the Sixth Circuit addressed the issue of "Associational Standing" and concluded that MRP can adequately demonstrate that its members satisfy the requirements for Article III standing (ECF No. 73 at PageID.1011). Defendants present no new arguments in support of these challenges, and the Court discerns no basis for revisiting its prior holdings.

views the complaint in the light most favorable to the plaintiff, accepting as true all well-pled factual allegations and drawing all reasonable inferences in favor of the plaintiff. *Gavitt*, 835 F.3d at 639-40. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). However, "a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt*, 835 F.3d at 640.

**3.     Effect of Prior Rulings in this Case**

Whether a plaintiff has stated a plausible claim under Rule 12 differs from the inquiry implicated by Rule 65, which, in First Amendment cases, centers on whether the plaintiff has demonstrated a likelihood of success on the merits of a claim. *See Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (describing the likelihood-of-success-on-the-merits factor as the "crucial inquiry" in First Amendment cases). Given that the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). *See also William G. Wilcox, D.O., P.C. Employees' Defined Ben. Pension Tr. v. United States*, 888 F.2d

1111, 1113 (6th Cir. 1989) (reversing and remanding the district court's grant of summary judgment because of the district court's incorrect application of the law of the case doctrine).

In contrast, however, "when a legal issue has been determined after an interlocutory appeal, the reviewing court's decision is the law of the case." *Michigan State AFL-CIO, Int'l Union v. Miller*, 6 F. Supp. 2d 634, 637 (E.D. Mich. 1998), aff'd sub nom. *Michigan State AFL-CIO v. Miller*, 215 F.3d 1327 (6th Cir. 2000). Specifically, "[w]hen the appellate panel considering the preliminary injunction has issued '[a] fully considered appellate ruling on an issue of law,' then that opinion becomes the law of the case." *Howe v. City of Akron*, 801 F.3d 718, 740 (6th Cir. 2015) (collecting cases from other circuits reaching the same conclusion); *see also Fish v. Schwab*, 957 F.3d 1105, 1141 (10th Cir. 2020) (joining the other circuits to reach the same conclusion). *See, e.g., Connection Distrib. Co. v. Reno*, 46 F. App'x 837, 837 (6th Cir. 2002) (finding that "the district court was correct in concluding that our prior decision affirming the district court's denial of a preliminary injunction, … constituted the law of the case as to the level of scrutiny to be applied").

"As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (citation omitted). The doctrine is not a limit on courts' power but "merely expresses the practice of courts generally to refuse to reopen what has been decided," a practice that "promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Id.* at 816-17 (citations omitted). *See also United States v. Todd*, 920 F.2d 399, 404 (6th Cir. 1990) (analogizing to the law of the case doctrine as applied in the civil context and finding

19

that "a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation").

Here, the Sixth Circuit issued a fully considered appellate decision on the legal issues in this case, a decision that this Court determines should be given effect in this stage of the litigation. However, assuming arguendo that the Sixth Circuit's rulings in the preliminary-injunction context are not binding on this Court's current task under Rule 12, the Court finds the rulings are persuasive, particularly where the parties' motion-to-dismiss papers either wholly incorporate or substantially repeat their preliminary-injunction arguments, the parties have not identified any intervening change in facts or law, and the Sixth Circuit's rulings are clearly stated and mirror this Court's own assessment of the legal sufficiency of Plaintiffs' claims.

### B.   Motion to Dismiss *Daunt*—The Lead Case

As the legal framework is the same for analyzing both claims in the Lead Case, the Court will consider them together.   VNP argues that the Lead Plaintiffs fail to state a claim in Count I because they have no First Amendment interest in membership on the Commission (ECF No. 34 at PageID.410).   Specifically, VNP argues that state laws that disqualify those with conflicts of interest, or the appearance thereof, from participating in governmental decision-making do not implicate the First Amendment (*id.* at PageID.410-414).   According to VNP, personnel decisions for high-level policy positions may be based upon partisan considerations (*id.* at PageID.414-417). VNP argues that even if the Court finds that the Lead Plaintiffs have identified a cognizable First Amendment interest, courts have routinely recognized that states and the federal government have compelling interests advanced by laws limiting government officials' political activities or precluding government service based on prior political activities (*id.* at PageID.418-422).   VNP argues that the Commission's membership qualifications are adequately tailored because they

identify and disqualify those officeholders or candidates whose jobs (or potential jobs) are on the line in redistricting—as well as their employees and the lobbyists hired based upon their relationships with those officeholders, and the family members who are financially dependent upon them retaining districts likely to elect them (*id.* at PageID.422-423).

VNP argues that it is also entitled to dismissal of the Lead Plaintiffs' Equal Protection claim in Count II (ECF No. 34 at PageID.423-424). According to VNP, "[n]one of the differences that plaintiffs cite implicate the Equal Protection Clause of the Constitution, and none is sufficient—let alone "plainly" so—to overcome the great deference "Michigan deserves [ ] in structuring its government" and "'determin[ing] the qualifications of [its] most important government officials'" (*id.* at PageID.424 (citations omitted)).

In support of dismissal of both Counts I and II, Secretary Benson relies on the arguments she made in response to the Lead Plaintiffs' motion for a preliminary injunction (ECF No. 43 at PageID.604). This Court previously summarized her argument pertaining to Count I (First Amendment) as follows:

> Secretary Benson argues that while Plaintiffs possess fundamental rights to political speech and association, the interests of the State plainly outweigh any burden or infringement of those rights caused by the provisions in § 6 (ECF No. 39 at PageID.547). According to Secretary Benson, the interest of the State at issue here—establishing a fair and impartial redistricting process—is fundamental (*id.*). Secretary Benson argues that the State has a "compelling" interest in deciding who will be responsible for redistricting in Michigan (*id.* at PageID.550). Secretary Benson points out that the eight ineligibility provisions in Article IV, § 6 (1)(b) were designed "to squeeze every ounce of incumbent and legislative influence out of redistricting" by excluding persons who presently, or have within the last six years, participated in the political operation of Michigan government in a partisan or nonpartisan capacity (*id.* at PageID.552, citing Bruce E. Cain, Redistricting Commission: A Better Political Buffer?, 121 Yale L. J. 1808, 1824 (2012) (discussing California's similar provisions after which Michigan's provisions are modeled)). Secretary Benson delineates how each of the Lead Plaintiffs "has a conflict or may reasonably be perceived as having a conflict of interest based on the office or position he or she currently holds" (*id.* at PageID.559). Secretary Benson argues that in contrast, the burden on Plaintiffs' speech and association

21

rights is both "minimal" and "temporary" where Plaintiffs, as Republicans, are eligible based on their party affiliation to apply for the four Republican seats in the 2030 redistricting cycle (*id.* at PageID.559-561).

(ECF No. 67 at PageID.948-949). This Court previously summarized Secretary Benson's

argument as to Count II (Equal Protection) as follows:

> Secretary Benson argues that there is more than a sufficient rational relationship between the disparate treatment of Plaintiffs and the government's interests (ECF No. 39 at PageID.564). Specifically, Secretary Benson maintains that "the manifest purpose of the amendment is to transfer the power of establishing legislative districts from the legislature and the political parties who dominate it to the hands of citizens without a personal stake in the details of how and where those districts are drawn" (*id.*). Secretary Benson opines that the government's legitimate interest in protecting the legitimacy of the people's chosen redistricting system is a clearly rational reason to exclude these categories of person from the Commission (*id.* at PageID.565). Secretary Benson argues that like other anti-nepotism statutes and restrictions, there is also a rational basis to exclude certain close family relations of that political class of persons, who can be presumed to have a financial or other interest in the outcome of the redistricting on behalf of their relatives (*id.* at PageID.565-566). Secretary Benson emphasizes that the Lead Plaintiffs' exclusion is not based upon their chosen party affiliation but upon their real or apparent conflicts of interest, i.e., their professional or financial reliance, as to the outcome of the decisions the Commission will be required to make (*id.* at PageID.567-568).

(ECF No. 67 at PageID.955-956).

Like their argument in support of their motions for a preliminary injunction, the Lead

Plaintiffs argue in response to the motions to dismiss that this is an "unconstitutional conditions"

case, not a "conflict of interest" case (ECF No. 57 at PageID.825-826). Specifically, the Lead

Plaintiffs argue that they have a First Amendment interest in the "constitutionally protected

activities used as a basis to disqualify Plaintiffs from Commission eligibility" (*id.* at PageID.822-

824). The Lead Plaintiffs assert that they must establish that "eligibility for Commission

membership would otherwise be available to them but for their exercise of constitutionally

protected rights, not that there is a distinct constitutional right to Commission membership" (*id.* at

PageID.825). Further, the Lead Plaintiffs argue that the categories draw arbitrary lines between

certain levels of partisan activity and are therefore not narrowly tailored to the government's interest (*id.* at PageID.827-830). The Lead Plaintiffs argue that they have also adequately pled violations of the Fourteenth Amendment (ECF No. 57 at PageID.830-832). Specifically, according to the Lead Plaintiffs, "[t]he end result of the over- and under- inclusiveness of the excluded categories discussed above is a stark and inappropriate disparity in treatment between the Plaintiffs and those who are eligible to serve on the Commission" (*id.*).

**Defendants' arguments for dismissal of the Lead Case have merit.**

As noted, the parties' motion-to-dismiss papers either wholly incorporate or substantially repeat their preliminary-injunction arguments. In affirming this Court's decision to deny preliminary injunctive relief, the Sixth Circuit held that "the eligibility criteria are constitutional under either the *Anderson-Burdick* test or the unconstitutional-conditions doctrine" (ECF No. 73 at PageID.996, citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)). Under the *Anderson-Burdick* test, which applies to both First Amendment and Equal Protection claims, the Sixth Circuit held that the eligibility criteria do not impose any "severe" burden on Plaintiffs and pointed out that "the Supreme Court has deemed similar restrictions on political expression to be minimal" (*id.* at PageID.998-999). The Sixth Circuit further held that "[e]ven if the eligibility criteria imposed a moderate burden on activities actually protected by the First Amendment, however, the Amendment would easily satisfy *Anderson-Burdick*'s middle-ground, 'flexible analysis,' under which we 'weigh[] the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it'" (*id.* at PageID.999 (citation omitted)).

Specifically, the Sixth Circuit determined that the burden on Plaintiffs is "relatively insignificant," given "(1) their ability to serve on the Commission after their six-year period of

ineligibility expires, (2) the lack of any direct prohibition or regulation of pure speech, and (3) the absence of any fundamental right to be a member of the Commission" (ECF No. 73 at PageID.999 (citations and footnote omitted)).   The Sixth Circuit found that in contrast, Michigan has both a compelling interest "in limiting the conflict of interest implicit in legislative control over redistricting" and "a fundamental interest in structuring its government" (*id.* at PageID.999-1000 (citations omitted)).  The Sixth Circuit concluded that the provisions Plaintiffs challenged "directly advance both of these interests" (*id.* at PageID.1000).

Additionally, the Sixth Circuit found the eligibility criteria constitutional under the unconstitutional-conditions doctrine, holding that a trilogy of Supreme Court cases—*United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75 (1947); *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548 (1973); and *Clements v. Fashing*, 457 U.S. 957 (1982)—"squarely foreclose the present challenge to the Amendment's eligibility criteria" (ECF No. 73 at PageID.1002) and that Plaintiffs' attempt to distinguish these cases was "unpersuasive" (*id.* at PageID.1003-1004).

For the reasons set forth *supra,* this Court finds persuasive, if not binding, the Sixth Circuit's decision that the eligibility criteria are constitutional.  Neither the parties' arguments nor the record has changed in the interim.  Accordingly, the Court holds that the Lead Plaintiffs have failed to state plausible claims for relief under the First and Fourteenth Amendments and that dismissal of this case is warranted.

## C.    Motion to Dismiss *MRP*—The Member Case

### 1.    <u>Violation of Freedom of Association [MRP]</u> (Count I)

VNP argues that Count I in the Member Case fails because the selection process does not violate MRP's freedom of association where political parties have no First Amendment

associational right to dictate the membership of government commissions (ECF No. 38 at PageID.505-508). Additionally, VNP argues that the fact that prospective commissioners self-designate their party affiliation (or non-affiliation) does not implicate MRP's associational rights because MRP has no constitutional right to have "bona fide affiliates" as commissioners, and it has no associational right to preclude the service of commissioners who self-designate their party affiliations (*id.* at PageID.508-509).

In support of dismissal of Count I, Secretary Benson relies on the arguments she made in response to the Member Plaintiffs' motion for a preliminary injunction (ECF No. 49 at PageID.701), which this Court previously summarized as follows:

> Secretary Benson argues that Plaintiffs' claim that the commissioners will be their "standard bearers" and representatives is based upon a fundamental misunderstanding of what the Commission is and who its members will be: "Commissioners are not party nominees or candidates, and so they are not chosen to be party standard bearers or to deliver the party's message" (ECF No. 45 at PageID.636-639). Secretary Benson emphasizes that the point of the movement driven by "Voters Not Politicians" was to have the districts drawn by the voters, rather than legislators or political insiders; therefore, the enacted provisions do not require that the applicants be actual *members* of any party—they need only attest to whether they affiliate themselves with a party (*id.* at PageID.638-639 [emphasis in original]). Secretary Benson also points out that the MRP has not alleged that it has, or could properly develop, a process to prevent or exclude people from voting for its candidates or claiming affinity with MRP (*id.* at PageID.640). Last, Secretary Benson points out that the MRP has remedies to pursue if it believes an individual is attempting to perpetrate some fraud in his or her application (*id.* at PageID.641).

(ECF No. 67 at PageID.960).

The Member Plaintiffs respond that they have stated a valid claim because associational freedom includes the right to engage in collective action in order to advance common political interests and "[i]ncluded within the right to collective action is the right of a political party to select its representative or 'standard bearer'" (ECF No. 54 at PageID.738). Like their arguments in support of a preliminary injunction, the Member Plaintiffs' argument opposing dismissal relies

heavily on the Supreme Court's decision in *California Democratic Party v. Jones*, 530 U.S. 567 (2000), which concerned a California proposition that converted the state's primary election from a closed to a blanket primary (*id.* at PageID.739). The Member Plaintiffs argue that the challenged provisions in this case similarly violate their rights to associate, and not to associate, because "applicants for Commissioner self-designate their affiliation with one of the two major political parties without any involvement or consent of that political party" and a legislative leader of the opposite party is allowed to strike its Republican applicants in a kind of "inter-party raiding" (*id.* at PageID.740-741, 744). The Member Plaintiffs argue that because political affiliation influences redistricting, they have the constitutional right to "select[] a standard bearer who best represents the party's ideologies and preferences" (*id.* at PageID.741-743, quoting *Jones* at 575). According to the Member Plaintiffs, the challenged provisions will "result in a situation where those who do not truly represent MRP are selected as Republican commissioners" (*id.* at PageID.740).

In reply, Secretary Benson emphasizes that there is no such office as a "Republican Commissioner" and that commissioners are not chosen to champion party platforms; rather, the commissioners' only function is to decide the boundaries of districts within which legislators will seek to be elected and to draw a fair map (ECF No. 61 at PageID.893). Secretary Benson opines that "the fact that the Member Plaintiffs appear to believe that this function is so intrinsic to the ideologies of the major parties that it can only be done by hand-picked party operatives does much to confirm many of the rationales advanced in support of the Amendment" (*id.*).

**Defendants' arguments for dismissal of Count I have merit.**

The Sixth Circuit held that "MRP fails to demonstrate that it has a First Amendment right to control the self-affiliation of commissioner-applicants with the Republican Party" (ECF No. 73 at PageID.1010). Specifically, the Sixth Circuit indicated that the Member Plaintiffs

"overextended" the Supreme Court's decision in *Jones*, which the Supreme Court limited to prohibit only those primary systems that allow voters of any affiliation to choose parties' nominees (*id.* at PageID.1006-1007).  According to the Sixth Circuit, this narrow inquiry into whether the challenged system actually involves the selection of a party's nominees "dooms" MRP's freedom-of-association claim (*id.* at PageID.1007).  The Sixth Circuit observed that the "standard bearers" in *Jones* were supposed to fight for partisan ends whereas the commissioners here are prohibited from doing so (*id.* at PageID.1007-1008).  The Sixth Circuit opined that the Member Plaintiffs mischaracterized the nature of the Commission and conflated identification with the Republican Party and identification with MRP, a state affiliate of the Republic Party (*id.* at PageID.1006, 1008-1010).

For the reasons set forth *supra,* this Court finds persuasive, if not binding, the Sixth Circuit's analysis and application of *Jones* and its conclusion that MRP fails to demonstrate that it has a First Amendment right to control the self-affiliation of commissioner-applicants with the Republican Party.  Neither the parties' arguments nor the record has changed in the interim.  Accordingly, the Court holds that the Member Plaintiffs have failed to state a plausible associational freedom claim on behalf of MRP and that dismissal of Count I is warranted.

**2.**     <u>**Violation of Freedom of Association [Individual Plaintiffs] and Violation of Equal Protection**</u> **(Counts II & V)**

In their Freedom of Association claim in Count II, the individual Member Plaintiffs allege that they express their political affiliation with the Michigan Republican Party through one or more of the roles described in the Commission's disqualifying criteria (Member Compl. ¶ 81, ECF No. 1 at PageID.19).  VNP argues that like the Lead Plaintiffs, the individual Member Plaintiffs have no First Amendment interest in membership on the Commission and therefore the Commission's qualification requirements violate neither their freedom of association nor equal protection rights

(ECF No. 38 at PageID.510).  Additionally, VNP points out that their conflicts of interest only preclude their service for a period of six years after the relevant activity ends, a waiting period for which Michigan has a rational basis, to wit:  "ensuring that a prospective commissioner's conflicts of interest have truly ended—and are unlikely to begin anew—prior to entrusting them with the power to shape district lines" (*id.* at PageID.510-511).

In support of dismissal of Counts II and V, Secretary Benson again relies on the arguments she made in response to the Member Plaintiffs' motion for a preliminary injunction (ECF No. 49 at PageID.701), which this Court previously summarized as follows:

> Secretary Benson argues that the Member Plaintiffs' argument on the merits of Count II also "misses the mark" (ECF No. 45 at PageID.642).  Like her argument in the Lead Case, Secretary Benson argues that while the individual Plaintiffs in the Member Case possess a fundamental right to freedom of association, the interests of the State plainly outweigh any burden or infringement of those rights caused by the provisions in § 6 (*id.* at PageID.644).  According to Secretary Benson, the interest of the State at issue here—establishing a fair and impartial redistricting process—is fundamental (*id.*).  Secretary Benson argues that the State has a "compelling" interest in deciding who will be responsible for redistricting in Michigan (*id.* at PageID.644).  Secretary Benson reiterates that the ineligibility provisions were designed "to squeeze every ounce of incumbent and legislative influence out of redistricting" by excluding persons who presently, or have within the last six years, participated in the political operation of Michigan government in a partisan or nonpartisan capacity (*id.*).  Secretary Benson delineates how each individual Plaintiff in the Member Case "has a conflict or may reasonably be perceived as having a conflict of interest based on the office or position he or she currently holds" (*id.* at PageID.647-649).  Last, Secretary Benson argues that the burden on Plaintiffs' association rights is both "minimal" and "temporary" where Plaintiffs, as Republicans, are eligible based on their party affiliation to apply for the four Republican seats in the 2030 redistricting cycle (*id.* at PageID.649-650).
>
> * * *
>
> Secretary Benson [argues] that the composition of the Commission does not violate Equal Protection (ECF No. 45 at PageID.662). Reiterating her arguments in the Lead Case, Secretary Benson argues that there is more than a sufficient rational relationship between the disparate treatment of the Member Plaintiffs and the government's interests (*id.* at PageID.663-665).

(ECF No. 67 at PageID.962-963, 968).

The Member Plaintiffs respond that they have stated a valid claim in Count II because the disqualifying criteria impose a substantial burden on the individual Plaintiffs' political association, "creating an impossible choice between foregoing First Amendment political activities that further their association with MRP, on the one hand, and continuing their associational activities at the cost of deemed ineligibility from the Commission, on the other hand" (ECF No. 54 at PageID.745-746).  The Member Plaintiffs argue that even if Michigan adequately establishes a compelling interest, the amendment is too far reaching and cannot withstand judicial scrutiny (*id.* at PageID.750-752).

Similarly, the Member Plaintiffs respond that they have also sufficiently stated an Equal Protection claim in Count V because the amendment draws distinctions between applicants for the Commission in two important ways, neither of which can survive such scrutiny: (1) numerous would-be applicants, including the individual Plaintiffs, are disqualified from service based solely on their current or past political activities, and others are disqualified by the sheer coincidence of a familial relationship to such disqualified individuals; and (2) the amendment distinguishes among applicants based on their self-designated political affiliation, or lack thereof, with one of the two major political parties (ECF No. 54 at PageID.761-770).

**Defendants' arguments for dismissal of Counts II and V have merit.**

The Sixth Circuit collectively analyzed the First and Fourteenth Amendment claims in these consolidated cases.  For the reasons set forth *supra,* this Court finds persuasive, if not binding, the Sixth Circuit's decision that the eligibility criteria are constitutional.  Neither the parties' arguments nor the record has changed in the interim.  Accordingly, the Court holds that the Member Plaintiffs have failed to state plausible claims for relief under the First and Fourteenth Amendments and that dismissal of Counts II and V is warranted.

3.     <u>**Violation of Freedom of Speech—Viewpoint Discrimination**</u> **(Count III)**

In their Count III, the Member Plaintiffs allege that "[a]pplicants who affiliate with one of the two major parties, including MRP, are disfavored because only four positions are reserved to each of the pools of affiliating applicants, while five positions are reserved to the pool of unaffiliating applicants" (Member Compl. ¶ 94, ECF No. 1 at PageID.20). VNP argues that the Commission's allocation of seats does not constitute viewpoint discrimination in violation of the First Amendment or the Equal Protection Clause where the Member Plaintiffs only speculate that the five unaffiliated commissioners will constitute "a monolithic bloc" and misconceive the role of commissioners (ECF No. 38 at PageID.511-514). VNP also emphasizes that Michigan has a legitimate interest in ensuring that a range of unaffiliated voters have an opportunity to participate in the decision-making process, an interest supported by a supermajority of Michigan voters (*id.* at PageID.514-516).

Secretary Benson relies on the arguments she made in response to the Member Plaintiffs' motion for a preliminary injunction (ECF No. 49 at PageID.701), which this Court previously summarized as follows:

> Secretary Benson argues that the amendment does not impose any kind of viewpoint discrimination (ECF No. 45 at PageID.653). Secretary Benson argues that Plaintiffs err in reducing the non-affiliated Commission seats to being "independent" seats, and Secretary Benson asserts that the MRP is not disadvantaged by having four members affiliated with it, as opposed to five members affiliating with all other groups and no group at all (*id.* at PageID.654). Secretary Benson also argues that a close review of the language of the amendment shows that the number of commissioners in each of the three groups has little effect on the relative power those groups will have in the Commission's decisions (*id.* at PageID.654-655).

(ECF No. 67 at PageID.964).

The Member Plaintiffs respond that they have stated a valid First Amendment claim in Count III because by specifically allocating commissioner seats based on political affiliation—a

minority of which are reserved to each of the major political parties—the amendment unconstitutionally discriminates based on viewpoint (ECF No. 54 at PageID.754-758).

In reply, Secretary Benson argues that while the Member Plaintiffs have yet to clearly articulate what viewpoint they seek to claim is being disadvantaged, either possible approach is a losing argument: if they seek to claim a viewpoint as "Republicans," then they must be considered against any other political party or no party (an argument that fails because no other group is given any advantage); and if they claim a viewpoint of "those who have a major party affiliation," then they must be included with the Democratic party-affiliating members as a group, and as a result the eight "affiliated" members outnumber the five non-affiliating members (ECF No. 61 at PageID.902-903).   Moreover, Secretary Benson points out that "raw numbers of members is irrelevant where the plan must be approved by at least two members from each pool" (*id.* at PageID.903).

**Defendants' arguments for dismissal of Count III have merit.**

The Sixth Circuit held that in order for MRP to demonstrate that the Amendment constitutes targeting by the government of "particular views taken by speakers on a subject," it would need to demonstrate that something about allocating five seats to individuals not affiliated with either of the two major parties constitutes differential treatment of Republicans on the basis of their views (ECF No. 73 at PageID.1014 (citation omitted)).   The Sixth Circuit concluded that "discrimination against the Republican viewpoint as a majority viewpoint is absent" where the Amendment provides for affiliates of the two largest parties to represent eight out of thirteen seats on the Commission (a majority) (*id.* at PageID.1015).   Quoting from VNP's appellate brief, the Sixth Circuit further pointed out that MRP had not explained how discrimination against the Republican viewpoint itself has occurred absent a showing that "the five unaffiliated

31

commissioners will constitute a monolithic bloc" (*id.*).  Last, the Sixth Circuit pointed out that the non-affiliating "viewpoint" has no greater sway in the actual decision-making of the Commission than the Democratic or Republican viewpoints (*id.* at PageID.1016).

For the reasons set forth *supra,* this Court finds persuasive, if not binding, the Sixth Circuit's conclusion that the Member Plaintiffs failed to demonstrate that the Amendment constitutes differential treatment of Republicans on the basis of their views.  Neither the parties' arguments nor the record has changed in the interim.  Accordingly, the Court holds that the Member Plaintiffs have failed to state a plausible viewpoint-discrimination claim and that dismissal of Count III is therefore warranted.

**4.    Violation of Freedom of Speech—Restricted Speech (Count IV)**

The last pending claim, the Member Plaintiffs' Count IV, implicates the open-meeting requirement of § 6, which instructs that commissioners "shall not discuss redistricting matters with members of the public outside of an open meeting of the commission" except to gain relevant information, if such communication occurs either "in writing" or "at a previously publicly noticed forum or town hall open to the general public."  MICH. CONST. Art. IV, § 6 (11).  VNP argues that the restriction on commissioners' discussion of redistricting outside of public Commission meetings does not violate the First Amendment because it is not a content-based regulation subject to strict scrutiny but a content-neutral restriction that easily satisfies intermediate scrutiny (ECF No. 38 at PageID.517-520).

Secretary Benson relies on the arguments she made in response to the Member Plaintiffs' motion for a preliminary injunction (ECF No. 49 at PageID.701), which this Court previously summarized as follows:

> Secretary Benson argues that this claim is seriously compromised by significant legal defects, including lack of standing by the Member Plaintiffs—non-

> commissioners—to raise this claim and the fact that the restriction applies only to the official speech of State officials and employees, which the State may properly regulate (ECF No. 45 at PageID.656-660). Secretary Benson points out that the restriction does not impose a blanket ban; rather, commissioners remain free to discuss the operation of the Commission as a body and may discuss redistricting with the public so long as they are gathering information from the public and doing so in writing or in a public forum (*id.* at PageID.660).

(ECF No. 67 at PageID.967).

The Member Plaintiffs respond that they have stated a valid claim in Count IV because the amendment imposes a content-based regulation that prohibits speech regarding an entire topic, one involving core political speech that is at the heart of First Amendment protection, with no compelling government interest (ECF No. 54 at PageID.758-760).

**Defendants' arguments for dismissal of Count IV have merit.**

The Sixth Circuit held that the challenged provision circumscribes some speech made in a commissioner's capacity as a private citizen, but the provision nevertheless survives constitutional scrutiny because "this burden is outweighed by Michigan's more-than-adequate justifications for limiting speech by commissioners on redistricting matters" (ECF No. 73 at PageID.1013). For the reasons set forth *supra,* this Court finds persuasive, if not binding, the Sixth Circuit's conclusion that the open-meeting requirement of § 6 survives constitutional scrutiny. *See, e.g., Connection Distrib.*, 46 F. App'x at 837 (finding that "the district court was correct in concluding that our prior decision affirming the district court's denial of a preliminary injunction, … constituted the law of the case as to the level of scrutiny to be applied"). Neither the parties' arguments nor the record has changed in the interim. Accordingly, the Court holds that the Member Plaintiffs have failed to state a plausible free-speech violation and that dismissal of Count IV is therefore warranted.

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Intervenor-Defendant's Motion to Dismiss (ECF No. 33) and Defendant Benson's Motion to Dismiss (ECF No. 42) are GRANTED, and the Lead Plaintiffs' Complaint in *Daunt et al. v. Benson*, 1:19-cv-614, is DISMISSED.

**IT IS FURTHER ORDERED** that Intervenor-Defendant's Motion to Dismiss (ECF No. 37) and Defendant Benson's Motion to Dismiss (ECF No. 48) are GRANTED, and the Member Plaintiffs' Complaint in *Michigan Republican Party et al. v. Benson*, 1:19-cv-669, is DISMISSED.

Because this Opinion and Order resolves all pending claims, a Judgment will also issue. *See* FED. R. CIV. P. 58.


Dated:   July 6, 2020                                                          /s/ Janet T. Neff
                                                                         JANET T. NEFF
                                                                         United States District Judge